UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| RAAFAT MOHAMMADKHANI, | )<br>) |
| Plaintiff, | ) CASE NO. : CV-S-02-0095-KJD-LRL<br>) CASE NO. : CV-S-02-0965-KJD-LRL |
| vs. | ) |
| JAMES M. ANTHONY, | ) |
| Defendant. | ) |
| RAAFAT MOHAMMADKHANI, | ) |
| Plaintiff, | ) **ORDER** |
| vs. | ) |
| COUNTY OF CLARK, a political subdivision of the State of Nevada, dba UNIVERSITY MEDICAL CENTER, | ) |
| Defendants. | ) |

Presently before the Court is Defendants' Motion for Summary Judgment (#270). The Court has also reviewed Plaintiff's Opposition (#283) and the Reply (#284). Although the grounds for the motion have been previously raised and even ruled upon in pre-trial matters, the Court has not specifically addressed post-trial, the *Faragher/Ellerth* defense or the qualified immunity defense. An order denying a motion for summary judgment is generally considered interlocutory and "subject to reconsideration by the courts at any time." Dessar v. Bank of America Ntl. Trust & Savings Assoc., 353 F.2d 468, 470 (9th Cir. 1965).

**The *Faragher/Ellerth* Defense as Applied to Defendant Clark County**

Defendant, U.M.C., contends that it cannot be held vicariously liable because it has satisfied the *Faragher/Ellerth* defense criteria. Specifically, Defendant asserts there is no dispute

that Plaintiff failed to pursue the remedy made available through the Clark County anti-discrimination policy, known as the Clark County Equal Opportunity-Affirmative Action Plan. That policy provided that any County employee could file a complaint of discrimination with the County's Equal Opportunity Division, a separate County unit from the employing units (UMC). It is undisputed that Plaintiff never took her complaints to the Equal Opportunity Division. On September 14, 1999, Plaintiff signed an acknowledgment that she had received her own personal copy of the Equal Opportunity-Affirmative Action Plan and understood it was her responsibility to become familiar with the material contained within it. Her only reason for not taking her complaint to the Equal Opportunity Division was a statement from her union steward, Nicholas Ritz, that on one occasion he had taken another employee (Dan Teach) to the EOD and had come to the impression that EOD would not provide a fair consideration of an employee's complaint. The deposition testimony of Mr. Teach was that he and Mr. Ritz had been told that the matters of which he was complaining were too old to be actionable. Plaintiff was again advised in writing on July 5, 2001, by John A. Espinoza, Assistant Administrator of Human Resources, that if Plaintiff believed she had been discriminated against, she had the right to file a complaint with the Clark County Equal Opportunity Division.

Mr. Ritz' comment to Plaintiff, as a union steward, not to utilize the EOD, contradicts the collective bargaining agreement negotiated by Plaintiff's union which provided that members bring discrimination complaints to the Equal Opportunity Division rather than having the union pursue such matters as grievances with management personnel at UMC. Pursuant to the union contract, management at UMC were not authorized to deal with discrimination complaints, therefore any meetings or complaints to Joe Dilag or any others in the UMC hierarchy were meaningless. Plaintiff's reliance on the "impression" of Nick Ritz is, as a matter of law, insufficient to provide any reasonable justification for her failure to pursue the remedy available through the Equal Opportunity Division. Even earlier personal experience that was considered by the victim to be unsatisfactory is insufficient reason for failure to use available and adequate procedures. See Holly D. v. Cal. Inst. of Tech., 339 F.3d 1158, 1178 (9th Cir. 2003). "Under similar circumstances, we have found a complete failure to use available and adequate

2

procedures to be unreasonable". Id., citing Kohler v. Inter-Tel. Techs, 244 F.3d 1167, 1181-82 (9th Cir. 2001); Montero v. AGCO Corp., 192 F.3d 856, 863 (9th Cir. 1999). This Court finds Plaintiff's failure to use the remedies available through the Economic Opportunity Division of Clark County to be unreasonable.

Defendant Clark County has established both that its efforts to provide relief were reasonable and that Plaintiff's decision to forego the available avenues of relief was unreasonable. Burlington Indus., Inc. v. Ellerth, 524 U.S. 742 (1998), and Faragher v. City of Boca Raton, 524 U.S. 775 (1998). Accordingly, the Court grants summary judgment to Defendant Clark County d/b/a University Medical Center.

**Defendant James Anthony's Claim to Qualified Immunity**

Defendant Anthony claims he is entitled to qualified immunity because it was not clear that his conduct was unlawful in the situation he confronted. Plaintiff asserts generally that it is well known that discrimination is unlawful. However, Saucier v. Katz, 533 U.S. 194, 202 (2001), makes it clear that the inquiry is whether it would be clear to a reasonable person in the Defendant's position that "what he is doing" violates the law, given the circumstances he confronted and the "specific context". Walker v. Gomez, 370 F.3d 969 (9th Cir. 2004); Rudebusch v. Hughes, 313 F.3d 506 (9th Cir. 2002).

Having reviewed the pleadings and trial transcript in its entirety, the Court has the advantage of a fully developed record in analyzing the issues raised by the instant motion. The Court is not required, as Plaintiff suggests, to look at only evidence which supports her position and disregard everything else in the record. To the contrary, the Court is required to consider the record as a whole and the totality of circumstances, including the context in which the alleged incidents occurred. See O'Shea v. Yellow Tech. Servs., 185 F.3d 1093, 1096 (10th Cir. 1999). It must appear that overt discriminatory bias "so poisoned the entire body of conduct toward Plaintiff that a jury reasonably could view all of the alleged harassing conduct . . . as the product of sex and gender hostility. Id. at 1102.

Plaintiff claims there was substantial evidence of a hostile work environment based upon her gender given the following: Porn viewing, prostitute discussion, ovary/medicine comment,

3

1  male/female doctors comment, Filipino women comment, husband/earning comment and
2  disparate desk assignment.
3       Plaintiff was the only witness to testify that Anthony was viewing porn.  She claimed that
4  on one occasion, in the presence of Dr. Holm, herself and others, Anthony used a computer to
5  access a website "with naked woman [sic] in it".  (Trial Tr. 17, November 1, 2005).  Dr. Holm
6  testified that he remembered the incident and that it was a website for a hotel "something like
7  you'd see for like the Bellagio or what-not."  He testified that it was not pornographic in any
8  way.  (Trial Tr. 157, November 9, 2005.)  Further, Mr. Terry Lewchanin examined the subject
9  computer as well as the one in the Anthony's office in connection with his official
10 responsibilities to maintain computers located at UMC Quick Cares.  Among the many things
11 that were verified was that none had accessed pornographic websites.  Mr. Lewchanin testified
12 that he was able to determine that none of the computers Anthony had been using, including the
13 one mentioned by Plaintiff, had accessed pornographic websites.  He further testified that the
14 process of deleting history is very complicated and that it was well beyond the ability of any of
15 the doctors at Craig Quick Care, including Dr. Anthony, to completely delete history at all
16 required levels.  (Trial Tr. 28-50, November 10, 2005.)
17      With respect to Plaintiff's allegation that Anthony engaged in a discussion concerning
18 prostitutes, it is claimed that she was working with Dr. Holm when Anthony started a
19 conversation "about his encounter with prostitutes in Thailand and how cheap their prices were".
20 (Trial Tr. 16, November 1, 2005.)  However, Dr. Holm testified that Anthony simply said
21 everywhere he went there were a lot of prostitutes that would run up and ask for business.  (Trial
22 Tr. 157, November 9, 2005.)
23      Plaintiff also takes offense at Anthony's statement that "ovaries and medicine don't mix"
24 and "male doctors are better doctors than female doctors".  However, most of the employees who
25 worked at Craig testified they never heard such comments.  So testified Shirley Ford, (Trial Tr.
26 122, November 9, 2005), Karen Hardy Brown, (Trial Tr. 149, November 9, 2005), Latonya
27 Washington, (Trial Tr. 5, November 10, 2005), Dr. Greg Fihn (Trial Tr. 9-10, November 10,
28 2005), Dr. Cornelius Verwys, (Trial Tr. 16-17,  November 10, 2005), Denise McClure, (Trial Tr.

187, November 10, 2005), Linda Jacob, (Trial Tr. 215-216, November 10, 2005), Debra Salerno, (Trial Tr. 45-46, November 3, 2005), Dr. Tanner, (Trial Tr. 173-174, November 7, 2005), and Pamela Shriver. (Trial Tr. 180-181, November 9, 2005.)  At most, the comments were isolated or sporadic.

Plaintiff next focuses on two questions from Anthony concerning whether her husband liked Filipino women and how much she earned compared to her husband.  The import of these comments is not clear.  The context of the earnings question was Plaintiff's insistence on being given more hours.   Plaintiff wanted as many hours as she could get.  (Trial Tr. 213-216, November 2, 2005.)  She wanted more than 120 hours per pay period.  None of the other doctors at Craig worked as many hours as Plaintiff. (Trial Tr. 218, November 2, 2005.)

The "disparate desk treatment" claim is completely unsupported.  It was established through many witnesses that desks were not assigned by Anthony or anyone else, and while individuals may have taken over desks and even set up personal photos and other items, Anthony did not assign desks. (Trial Tr. 187, November 8, 2005;  Trial Tr. 158, November 9, 2005.)

Plaintiff cites several examples to support her claim of harassment based upon national origin, including Anthony's alleged comments: "Is this how they do it in Russia"?, "You don't know anything about the law", and "You and your husband do not understand how things are done in this country".  Plaintiff testified variously that she considered herself to be white, Caucasian, Turkish-Russian, and produced medical records showing she once claimed to be Iranian.  Anthony's comments were not shown to be frequent, severe or pervasive, and while Plaintiff may have found them offensive, they do not meet the threshold for a hostile environment claim.  Similarly, Anthony's pet names for employees of whom only Dan Teach took offense, do not rise to anything more than joking and teasing comments.

Other courts have rejected hostile work environment claims under circumstances that were far more offensive.  See, e.g., Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 269-71 (2001)(finding that male supervisor reading a comment from an employee evaluation that a co-worker had said, "I hear making love to you is like making love to the Grand Canyon," and then laughing about it fails to create a hostile work environment); Morris v. Oldham County Fiscal

5

1  Court, 201 F.3d 784, 790 (6th Cir. 2000) (holding that the employer's alleged request for sexual
2  favors from the employee in exchange for a better evaluation, calling the employee "Hot Lips,"
3  making comments about the employee's state of dress, and telling dirty jokes in front of the
4  employee did not create hostile working environment); Burnett v. Tyco, 203 F.3d 980, 985 (6th
5  Cir. 2000), (holding that the conduct of a supervisor who placed a pack of cigarettes under a
6  female employee's bra strap, remarked that she had "lost her cherry," and said he was aroused by
7  the phrase "dick the malls" was not sufficiently severe to create a hostile work environment);
8  Black v. Zaring Homes, Inc., 104 F.3d 822, 826 (6th Cir. 1997) (holding that a supervisor's
9  teasing about the employee dancing on tables at a local strip bar, joking about "Hooterville" or
10 "Titsville," calling her a "broad," and making fun of her pronunciation of "bosom" did not create
11 an objectively hostile environment).

12      Plaintiff next claims that facially neutral harassment consisted of hours reduction, the
13 Abe Lincoln quote, a disciplinary investigation, an immediate peer review, the Pilipal counseling
14 incident, the pediatric privileges memo, insurance memo, peer review meetings, callback
15 incidents, September 1 disciplinary investigation, double-booking incidents, osteopathic
16 complaints and internal medicine complaint.

17      The hours reduction complaint deals with the limitation of the number of hours worked at
18 UMC Quick Cares.  This was a UMC Quick Care policy at all locations and applied across the
19 board to male and female doctors. It was an item in 1999-2000 labor negotiations.  Concern was
20 expressed that too many hours result in too many mistakes and that bad things occur more
21 frequently when doctors are tired.  (Trial Tr. 102-3, November 8, 2005.)  Plaintiff wanted more
22 than 120 hours per pay period and she received more.  None of the other doctors at Craig
23 received as many hours as Plaintiff. (Trial Tr. 213-218, November 2, 2005.)  Plaintiff missed no
24 time at work and worked 3,195.8 hours that year. (Trial Tr. 120-122, November 4, 2005.)  The
25 obvious motivation for this was not only hourly pay, but patient bonuses of $1.00 per patient.
26 (Trial Tr. 224, November 2, 2005; Trial Tr. 98-99, November 4, 2005.)

27      The Abe Lincoln quote about "standing firm" is in the same category as Plaintiff's
28 speculative interpretation of "parking lot meetings".

6

1    The investigatory meetings were nothing more than dealings with patient complaints, x-ray and lab orders, and no-charges.  Though Plaintiff took offense to Anthony's investigation, the investigation was clearly within his area of authority and responsibility in carrying out UMC policy to follow up on such items.  The failure of UMC to catch or punish every violation is not, without more evidence, proof that the policy was being applied in a discriminatory fashion.  In fact, Plaintiff was the only physician supervised by Anthony at any UMC facility who was not disciplined by Anthony at one time or another.  (Trial Tr. 64, November 9, 2005).  As medical supervisor, Defendant Anthony had a responsibility to investigate complaints against doctors working under his supervision.  In one instance, Plaintiff left a patient, Pamela Shriver, in need of life saving measures to go speak with another doctor.  Fortunately, a pediatrician came to her rescue.  (Trial Tr. 183, November 9, 2005).  Defendant Anthony had a duty to follow up on such matters and many testified that he did so without respect to race or gender.  (Trial Tr. 110, 149, November 9, 2005.)

Plaintiff's complaints regarding peer review are similarly flawed.  The uncontradicted trial testimony is that all physicians received peer review.

The Caroline Pilapil incident is nothing more than Defendant Anthony responding to a complaint from a nurse who alleged Plaintiff abused her.  As Plaintiff's supervisor, it was Anthony's responsibility to investigate.

Plaintiff next complains that Defendant Anthony required her to sign a corrective counseling notice or she would be found to be insubordinate.  Plaintiff complains that this was an example of a supervisor "showing a subordinate who is boss".  The function of a medical director is to supervise.  Supervision includes the authority to issue consequences when directives are not followed.  Anthony could not reasonably anticipate that he could be held liable for investigating a claim that one of his subordinates had been abusive to a nurse.

The limitation on pediatric activities was reasonable given that Plaintiff was not qualified and had no such privileges at the time.  (Trial Tr. 92, November 4, 2005.)

The ordering of labs on a patient whose insurance might not cover such labs was demonstrated to be a concern throughout the UMC chain. It was not an abuse of authority for Anthony to address a memo to Plaintiff concerning such matters.

Complaints regarding Plaintiff carrying more than one chart into a room and speaking in baby talk are entirely within the discretion of a medical supervisor such as Anthony to address. Concerns of patient confidentiality and speaking in a loud voice were also noted by Plaintiff's other supervisors. Many co-workers testified that Plaintiff was loud and interruptive, (Trial Tr. 203-206, November 10, 2005), monopolized nurses' time, (Trial Tr. 50-52, November 9, 2005), was taking up all eight examination rooms, (Trial Tr. 161, November 9, 2005), was taking multiple patient charts so other doctors could not see patients because she was taking up all the files and all the rooms (Trial Tr. 20-22, November 10, 2005), using a loud voice ("you have herpes"), (Trial Tr. 193, November 8, 2005), hollering to patients standing outside their doorways, (Trial Tr. 181, November 9, 2005), and was using very loud baby talk. (Trial Tr. 160, November 9, 2005.)

Others testified Plaintiff was disruptive. (Trial Tr. 11-12, November 14, 2005.) There was testimony that Plaintiff handed off charts to nurses working with other doctors to speed up flow on her side, that she was demanding and loud and could be heard on the other side of the clinic. (Trial Tr. 106-109, November 9, 2005.) Pamela Shriver was off duty and with her minor daughter during one incident when Plaintiff said of an uninsured pregnant woman who was being treated following an industrial accident: "Get her out of my clinic"...she "wants to get a free ultrasound from it". (Trial Tr. 171-178, November 9, 2005.)

Similar difficulties followed Plaintiff to Nellis Quick Care where she was loud, having sensitive conversations with patients in the hallways, grabbing up charts when there were few to go around and at other times, sorting through charts and taking patients easily seen and quickly disposed of to make her productivity look good. (Trial Tr. 115-120, November 7, 2005.)

Plaintiff could not get along with many of the employees at Craig Quick Care. She admitted requesting that the following be transferred out of Craig Quick care: Linda Jacob, Debra

Salerno, Dr. Holm, Dr. Verwys, Denise McClure, Mildred Padua, Shirley Ford, Caroline Pilapil and Pam Shriver.  (Trial Tr. 145-146, November 2, 2005.)

A supervisor could not reasonably expect to be held liable for enforcing patient confidentiality, callback rules or counsel against using a baby voice.  Although Plaintiff testified she used a baby voice in speaking with pediatric patients, others testified, without contradiction, that she used it in speaking with adults as well. (Trial Tr. 182-184, November 9, 2005.)

The misnamed "double booking incident" (in actuality, booking through the lunch hour) cannot be attributed to Dr. Anthony.  The scheduler, Nancy Priebe, testified that she was not instructed by Anthony to do it.  (Trial Tr. 35, November 8, 2005.)  Plaintiff requested to be scheduled through lunch. (Trial Tr. 7, November 10, 2005.)  Her speculation that this is something that could have happened in one of the "closed door meetings" is not sufficient to attribute it to Dr. Anthony.

The osteopathic board complaint deals with Plaintiff's use of a business card that falsely averred she was board certified in internal medicine.  Anthony, as a supervisor, could not reasonably be expected to anticipate that responding to a false representation of credentials by one of the physicians he was responsible to supervise would subject him to liability.   Linda Jacob testified that it was Plaintiff who requested  the terminology "board certified" be placed on her business card.  When Jacob questioned it, Plaintiff stated "I will pass". (Trial Tr. 220, November 10, 2005.)  Plaintiff failed the internal medicine exam in 2001 and again in 2002.  Although Plaintiff said she could not recall whether she passed out the cards or even opened or looked at them (Trial Tr. 81-90, Nov. 4, 2005), two witnesses testified that they saw her handing out the cards.  (Trial Tr. 104, November 8, 2005; Trial Tr. 183, November 9, 2005.)

Anthony's first wife was Lebanese.  His second wife, with whom he had two children, is Mexican.  He also testified his fiancé is Cuban/Mexican.  (Trial Tr. 170-171, November 8, 2005.)  Of the employees from Craig Quick Care who testified at trial, none but Plaintiff and Dan Teach felt there was any racial or gender discrimination on the part of Anthony.  Also, Anthony recommended hiring Plaintiff (Trial Tr. 176, November 8, 2005), and recommended her as employee of the month. (Trial Tr. 184-90, November 8, 2005.)   At about the same  time Plaintiff

claimed that Anthony started harassing her, Anthony could have terminated her or extended her probationary period, but did not do so. (Trial Tr. 200, November 8, 2005.)

The Ninth Circuit has held that "where the same actor is responsible for both the hiring and firing of a discrimination plaintiff...a strong inference arises that there was no discriminatory action." Bradley v. Harcourt, Brace & Co., 104 F.3d 267, 270-71 (9th Cir. 1996).  This "same-actor inference" applies when, as in the present action, the same person not only recommended hiring her, but also did not extend her probationary period or terminate her as he could have, and designated her as employee of the month.  See Coghlan v. American Seafoods Co. LLC, 413 F.3d 1090, 1096 (9th Cir. 2005) (citing Hartsel v. Keys, 87 F.3d 795, 804 n.9 (6th Cir. 1996)).  When, as in this case, "the allegedly discriminatory actor is someone who has previously selected the plaintiff for favorable treatment, that is very strong evidence that the actor holds no discriminatory animus, and the plaintiff must present correspondingly stronger evidence of bias in order to prevail." Coghlan, 413 F.3d at 1097 n.10.

**Conclusion**

After reviewing all of testimony and evidence regarding alleged conduct of Defendant Anthony, and the context in which it occurred, the Court finds that it would not be clear to a reasonable person in his position that his specific acts were unlawful.  None of Defendant Anthony's actions included any harsh racial or gender slurs.  Indeed, with the exception of Plaintiff and Dan Teach, other witnesses testified they did not feel his comments were inappropriate, discriminatory or hostile.

There is nothing which would have made clear to Defendant Anthony that his actions, in the context of supervising Plaintiff in the circumstances set forth above, would be in violation of the law. Saucier v. Katz, 533 U.S. 194, 202.  This Court has consistently found that the evidence of discrimination in this case is extremely thin.  Plaintiff never complained to her union representative, Brad Walker, until after she received her evaluation in May of 2001.  (Trial Tr. 37, November 7, 2005.)  Despite her interpretation of that evaluation and her threats toward Anthony, her treatment was fair and consistent with that experienced by other physicians, male

and female, without regard to national origin. Accordingly, the Motion of Defendant Anthony for Summary Judgment based upon Qualified Immunity is also granted.

IT IS HEREBY ORDERED that Defendants University Medical Center and James M. Anthony's Motion for Summary Judgment (#270) is **GRANTED**;

IT IS FURTHER ORDERED that the pre-trial conference set for Wednesday, August 15, 2007 is **VACATED**;

IT IS FURTHER ORDERED that the Clerk of the Court enter **JUDGMENT** for Defendants and against Plaintiff.

DATED this 10th day of August 2007.

_____
Kent J. Dawson
United States District Judge